PREET BHARARA
United States Attorney for the
Southern District of New York
By: JAIMIE L. NAWADAY
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No.   (212) 637-2528
Facsimile No.   (212) 637-2730
jaimie.nawaday@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
PETER BELLI

      Plaintiff,

      -against-

ALLIED HOME MORTGAGE CAPITAL
CORPORATION

      Defendant.

---

UNITED STATES OF AMERICA

      Plaintiff-Intervenor,

      -against-

ALLIED HOME MORTGAGE
CORPORATION, ALLIED HOME
MORTGAGE CAPITAL
CORPORATION, JIM C. HODGE, and
JEANNE L. STELL

      Defendants.

11 Civ. 05443 (VM)

**COMPLAINT-IN-INTERVENTION
OF THE UNITED STATES OF
AMERICA**

**JURY TRIAL DEMANDED**

The United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), brings this complaint-in-intervention against Allied Home Mortgage Capital Corporation ("Allied"), Allied Home Mortgage Corporation ("Allied Home Mortgage"), its President and Chief Executive Officer Jim C. Hodge, and its Executive Vice President, Jeanne L. Stell, alleging upon information and belief as follows:

## INTRODUCTION

1.     This is a civil fraud action by the United States of America to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq*, civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, and for injunctive relief under the Fraud Injunction Statute, 18 U.S.C. § 1345, arising from fraud on the United States Department of Housing and Urban Development ("HUD") in connection with Allied's residential mortgage lending business.  As set forth more fully below, Allied has profited for years as one of the nation's largest FHA lenders by engaging in reckless mortgage lending, flouting the requirements of the FHA mortgage insurance program, and repeatedly lying about its compliance.  In the past decade, Allied has originated loans out of hundreds of branches it never disclosed to HUD, submitted knowingly false statements to HUD concerning its branch operations and accumulating sanctions, and lied to conceal its dysfunctional operations from HUD.  Allied's decade of concealed misconduct has resulted in tens of thousands of defaulted loans, thousands of American homeowners facing eviction, and hundreds of millions of dollars in losses to the United States.

2.     HUD, through its Federal Housing Administration ("FHA"), insures lenders against losses to homebuyers.  FHA insures approximately one third of all new residential mortgages in

2

the United States and is the largest mortgage insurer in the world. Under HUD's mortgage insurance program, if a homeowner defaults on the loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD incurs expenses in managing and marketing the foreclosed-upon property until it is resold.

3. By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of Americans who could not otherwise qualify for a mortgage. FHA mortgage insurance also makes mortgage loans valuable in the resale market.

4. The continued availability of FHA mortgage insurance requires that HUD accurately assess the risk of default on the loans it insures. To accomplish this task, HUD relies on assurances by lenders that the loans they submit for insurance comply with HUD standards and guidelines specifically designed to mitigate the risk to HUD, including, most fundamentally, that the loan originated from a HUD-approved lender and a HUD-approved branch office.

5. Allied, which bills itself as one of the nation's largest privately-held mortgage brokers, was, until recently, an approved FHA loan correspondent. As a loan correspondent, Allied had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying mortgagees, known as "sponsor" mortgagees. Between January 1, 2001, and the end of 2010—when HUD discontinued the loan correspondent program—Allied originated 112,324 home loans. Of those loans, 35,801 (or nearly 32% percent) have defaulted, resulting in more than $834 million in insurance claims paid by HUD. Of the defaulted loans, 6,404 were early payment defaults, (i.e., loans that defaulted within the first six months). In 2006 and 2007, Allied's default rate climbed to a staggering 55%, and its early payment default rate exceeded

3

10%. The loans originated in just that two-year period resulted in $170 million in insurance claims paid by HUD. Finally, an additional 2,509 Allied loans are currently in default but not yet in claims status, which could result in additional insurance claims paid by HUD amounting to $363 million.

6.     While Allied made substantial profits through its origination and sale of FHA-insured mortgages, it willfully violated the requirements that provide protection to HUD's insurance fund and deceived HUD along the way. For instance, for years Allied originated loans out of hundreds of "shadow" branches that were not approved by HUD, then submitted those loans to HUD using one of the unique branch identification numbers ("HUD IDs") assigned to a HUD-approved branch. HUD endorsed these loans for insurance based on false certifications that the loans were originated in compliance with HUD requirements, including, most fundamentally, that the loans originated from HUD-approved branches. Although several senior managers voiced concerns about this practice, it was continued under the direction of Hodge, Allied's CEO.

7.     Even when Allied sought HUD approval for its branches, it lied to obtain that approval. Each time Allied opened a new branch and applied for HUD approval, it falsely certified that the branch office met all HUD/FHA requirements and, specifically, that Allied would pay all operating costs of the branch office. For the last ten years, however, Allied maintained a corporate policy of requiring branch managers to assume financial responsibility for their branches. Allied thus operated its branches like franchises, collecting revenue while the branches were profitable, then closing them without notice when they were not, leaving the branch managers liable for the branch's financial obligations. Well aware that this practice was

prohibited by HUD, Allied's Executive Vice President, Jeanne Stell, instructed branch managers how to answer questions from HUD auditors, and acknowledged in an email that she instructed someone else to sign the certifications because she knew that they were false.

8.      Allied also failed to implement an internal quality control plan, effectively allowing its shadow branches to operate independently of any scrutiny whatsoever.   Allied utterly failed to conduct audits of its branches or review its early payment defaults as it was required to do by HUD.   Indeed, Allied never hired an adequate staff to conduct quality control.   Even while it was operating 600 or more branches at a time, Allied maintained only two quality control employees in its corporate office.

9.      Allied maintained a handful of additional quality control staff members in St. Croix, in the U.S. Virgin Islands, but its offshore employees had no mortgage experience and, according to multiple witnesses, did not even know what a mortgage was.   When HUD asked Allied to provide up-to-date quality control reports in early 2009, Allied simply could not comply. Nevertheless, at the direction of Hodge, Allied concealed its failure by preparing reports without conducting the requisite loan file review and then submitted fraudulent quality control reports to HUD.

10.      Finally, Allied concealed from HUD information it was obligated to disclose, including information about sanctions by state regulators and felony convictions of employees. Such information would have alerted HUD to Allied's lack of internal controls and habitual disregard of regulations.   Allied faced sanctions by one or more states every year for many years, yet repeatedly certified to HUD that it had not been sanctioned by any state in which it operated.

5

11.     Allied operated with impunity for many years due to a culture of corruption created by Hodge, who eliminated the position of chief financial officer and other senior management positions, intimidated employees by spontaneous terminations and aggressive email monitoring, and silenced former employees by actual and threatened litigation against them. As a result, Allied was able to conceal its dysfunctional operations and maintain its profitable position in the mortgage industry.

12.     The United States seeks the maximum amount of damages and the maximum amount of civil penalties allowed by law, and an injunction preventing further loan origination from shadow branches. Specifically, the United States seeks treble damages under the False Claims Act and compensatory damages under the common law theory of indemnification for each of Allied's defaulted loans. The United States also seeks to recover damages and civil penalties under FIRREA for each of the hundreds of false certifications and other false statements submitted to HUD.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331 and 1345, and the Court's general equitable jurisdiction.

14.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because the defendants transact business in this judicial district, including by selling loans and transferring loans to other sponsor mortgagees headquartered in this district.

## PARTIES

15.     Plaintiff is the United States of America.

16.     Relator Peter Belli is an individual domiciled in Massachusetts and a former branch manager for Allied.

17.     Defendant Allied is a Texas corporation with its principal place of business located in Houston, Texas.  Allied bills itself as one of the nation's largest privately held mortgage brokers and was approved by HUD to be an FHA loan correspondent, meaning it had the authority to originate HUD-insured mortgage loans for sale or transfer to other qualifying mortgagees, known as "sponsor" mortgagees for underwriting and closing.  Allied was an approved loan correspondent from approximately September 26, 1991 until December 31, 2010, when HUD discontinued the loan correspondent program.   Allied was also a licensed mortgage banker in the State of New York from August 2005 to November 2010, when it surrendered its license.   Allied is owned 49.5% by Jim Hodge, 49.5% by Jim Hodge's wife, Kathy Hodge, and 1% by Jim Hodge's son, Jamey Hodge.

18.     Defendant Allied Home Mortgage is also a Texas corporation with its principal place of business in Houston, Texas.  Allied Home Mortgage bills itself as one of the nation's largest privately held mortgage bankers and one of the nation's largest FHA lenders.  Allied Home Mortgage has been approved by HUD since 1992 to be a direct endorsement lender and thus had the ability to "sponsor" loans originated by Allied by underwriting and endorsing those loans for HUD insurance.   Allied Home Mortgage is also the successor entity to, and a mere continuation of, Allied, as Allied recently terminated all of its branch offices and reopened them as

7

branches of Allied Home Mortgage.   Allied Home Mortgage also maintains the same management and ownership structure as Allied.

19.    Defendant Jim Hodge is the founder, President and Chief Executive Officer of Allied, the sole director of Allied, and an individual with domiciles in Texas, St. Croix, Colorado, and South Dakota.   In addition to owning Allied and Allied Home Mortgage, Hodge owns dozens of shell companies in the United States, the U.S. Virgin Islands, and the Cook Islands, the purpose of which, according to numerous witnesses, is to permit Hodge to continue to operate in the mortgage lending business even if Allied and/or Allied Home Mortgage are effectively shut down by sanctions or legal judgments.

20.    Defendant Jeanne Stell is a Texas resident and the Executive Vice President and Director of Compliance of Allied and Allied Home Mortgage.   Stell has held a senior management position at Allied and Allied Home Mortgage since approximately 2001, with the exception of a temporary absence between November 2007 and early 2010.   Stell also served as Allied's primary contact person for the New York State Banking Department.

**CIVIL STATUTES TO COMBAT MORTGAGE FRAUD**

21.    The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3729(a)(1)(A)–(B).

22.    The False Claims Act further provides that for persons who violate the Act: "[such person] is liable to the United States Government for a civil penalty of not less than [$5,500] and

8

not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person . . ." 31 U.S.C. § 3729(a).

23.     Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that affect financial institutions and certain government agencies.  *See* 12 U.S.C. § 1833a(e).   Two of the predicate offenses that can form the basis of liability under FIRREA are relevant here.   First, 18 U.S.C. § 1006 prohibits any person, who is "connected in any capacity with [HUD]" from "mak[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner, or agent . . . of [a] department or agency of the United States."   Second, 18 U.S.C. § 1014 prohibits any person from "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of [FHA]."  *Id.*

24.     FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $5 million or $1 million per day, whichever is less.   The statute further provides that the United States can recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.

25.     Finally, the Fraud Injunction Statute authorizes the United States to commence a civil action to enjoin any "person" who is "violating or about to violate" (among other criminal statutes) 18 U.S.C. §§ 1006 and 1014, from committing further violations of those statutes.   18 U.S.C. § 1345(a)(I)(B).

9

## FACTUAL BACKGROUND

### A. The FHA Mortgage Insurance Program

26.　　Pursuant to the National Housing Act of 1934, the FHA offers various mortgage insurance programs.　Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing.　The program helps low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.　FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

27.　　A HUD-approved loan correspondent, such as Allied, can originate loans, but is required to send them to a HUD-approved direct endorsement lender, such as Allied Home Mortgage, for underwriting approval prior to loan closing and securing an insurance endorsement from HUD.　Based on the information gathered by the loan correspondent, the sponsor mortgagee underwrites the loan and decides whether the borrower represents an acceptable credit risk for HUD.

28.　　A fundamental rule of the HUD insurance program is that a lender must be approved by HUD to originate, purchase, hold, or sell HUD/FHA-insured mortgages.　For a loan correspondent, such as Allied, HUD requires not only that the lender be approved generally but also that the lender obtain HUD approval for each branch office from which the lender intends to originate HUD-insured loans.

29.　　To obtain HUD approval to originate FHA loans from a specific branch office, the loan correspondent must submit a form (HUD Form 92001-B) to HUD containing basic information about the branch, a general certification that the branch "meets all HUD/FHA

10

requirements," and a specific certification that the lender "will pay all operating costs of the branch office . . . ."

30. The purpose of requiring the lender to pay operating costs of its branch office is to prevent the lender from operating "net branch" or "franchise" offices that provide a potential revenue stream at little cost to the lender. Although lenders are permitted to pay branch managers the commission resulting from branch revenue minus branch expenses, they must remain the financially responsible party and be the ultimate guarantor on branch contractual obligations. If a lender is permitted to operate "no cost" branches by paying its branch managers purely on commission and assuming no ultimate financial responsibility for the branch, it will have an incentive to add far more branches than it can effectively supervise and control.

31. After submitting the certification, the loan correspondent receives a HUD ID that permits the branch to originate FHA loans. To monitor lender default rates on a branch-by-branch basis, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD.

32. If a branch's default rate exceeds 200% of the regional average for HUD approved lenders, HUD issues a "Credit Watch Termination" that revokes the lender's approval to originate FHA loans at that branch and suspends approval of any new branches within a specified area. This area, roughly the size of a state, is formally referred to as a "HUD field office jurisdiction."

33. To maintain HUD-approved status, loan correspondents and direct endorsement lenders must also submit annual certifications to HUD. The annual certifications contain four distinct representations, set forth below:

11

I certify that none of the principals, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government.

I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans.

I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, and policies.

I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above named lender is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

34.    Among the requirements for both loan correspondents and direct endorsement lenders to maintain HUD-FHA approval is that they implement a quality control program, which, among other things, ensures compliance with certain key HUD requirements.

35.    As part of its quality control program, a mortgagee must (a) conduct an on-site audit of all branch offices within 90 days of opening and annually thereafter; (b) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (c) review all early payment defaults (*i.e.*, those that default within the first six months).   Review of early payment defaults is particularly important because such defaults are indicative of mortgage fraud.

36.    Finally, each loan file submitted for HUD insurance contains a loan-specific certification –HUD Form 92900-A– in which a lender certifies that the information contained in the application is "true to the best of the lender's knowledge and belief."   If, when the loan "is

12

submitted [to HUD] for endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance."  HUD Handbook 4000.4, paragraph 1-3.

37.     In the event that a borrower defaults on an FHA-insured mortgage, the holder of the loan submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property.  HUD then pays off the balance of the mortgage and other related costs, and may assume ownership of the property.  In the mortgage industry, HUD-insured loans are highly marketable for resale to investors both because such loans are expected to have met HUD requirements and because they are backed by the full faith and credit of the United States.

**B.  Allied's Deception of HUD**

**1.  Allied Originates Loans Out of Unapproved "Shadow" Branches**

38.     For years, Allied originated thousands of FHA loans out of branches that were not HUD approved.  Allied originated these loans by "marrying" an unapproved branch to an approved branch and entering the HUD ID of an approved branch on all loans originated from the "shadow" branch.   In the last decade, Allied has operated hundreds of shadow branches, including in regions where HUD terminated Allied's approval to originate FHA loans.

39.     In operating its shadow branches, Allied was well aware that it was flouting HUD's requirements.   In 2000, a HUD audit of two Allied branch offices in Arizona found that Allied was operating thirteen unapproved "satellite" offices, one of which originated 221 loans in 24 months, "more than [Allied's] registered branch offices and satellite offices combined."

40.     Although in 2000 HUD permitted the use of unapproved "satellite offices" for certain limited activities, satellite offices could not originate FHA loans.

13

41.    In 2002, HUD revisited Allied's branch offices in Arizona and again found Allied to be originating FHA-insured loans out of satellite offices.   HUD requested indemnification for the loans originated from the non-approved offices and reminded Allied that any "office that originates and processes FHA-insured mortgages must be approved by HUD."

42.    Finally, a June, 2005 review of Allied's branch in Fresno, California revealed that "Allied failed to seek HUD's approval for several branch locations where FHA insured loans are originated and processed.   This practice violates the certifications made on HUD Form 92900A [the individual loan certification]."

43.    By 2006, HUD no longer permitted even limited-use satellite offices and required that every office that originated or processed FHA loans in any way had to be approved by HUD, thereby creating a bright-line rule for enforcement.   Allied's Executive Vice President, Jeanne Stell, thereafter sent a memo to all branch managers, notifying them that the revised HUD Handbook required that "FHA loans must be originated and processed from a 'HUD/FHA registered/approved' location."

44.    Even while reminding branch managers of HUD's requirement, however, Allied continued to violate it, operating newly-opened shadow branches in regions where HUD terminated its approval to originate FHA loans.

45.    In March of 2006, HUD issued a Credit Watch Termination of Allied's origination authority within the Greensboro, North Carolina HUD field office jurisdiction, thereby barring Allied from originating FHA loans from the branch that prompted the termination as well as from newly-opened branches throughout North Carolina.

14

46.     Notwithstanding its termination, Allied continued to open new branches in that area, approximately one or two per month, and nearly all of those branches secretly originated FHA loans.  Allied achieved this deception by submitting the loans to HUD under the HUD ID numbers of other, still-approved branches.

47.     Several senior managers raised their concerns about Allied's practice with Hodge. The practice persisted, however; the decision to do so, according to witnesses, was "mainly Jim's decision."

48.     Although Allied sought HUD approval for a total of eight branches in North Carolina, Allied originated FHA loans out of more than *seventy* shadow branches in that state without HUD's knowledge or approval.

49.     Allied's default rates should have prompted earlier and additional Credit Watch Terminations, but Allied manipulated the HUD ID system to conceal its true default rates. Specifically, Stell monitored the default rate of each branch and applied for a new HUD ID for any branch whose default rate approached 200%.  When applying for a new HUD ID, Stell changed the address of the branch superficially (*e.g.*, adding a Suite number, or changing "Street" to "St."), so that the automated FHA system could not detect that the ID was sought for an existing branch. The new ID provided a brand new default rate, clearing the past rate.

50.     When HUD updated its system to prevent such manipulation, Allied found a new way to conceal its default rates.   In late 2010 and early 2011, Allied switched all of its remaining, approved branches from the ownership of Allied to Allied Home Mortgage, thereby obtaining a new ID for each branch, and thus again achieving a clean slate on its default rates.

51.     Allied's use of shadow branches was not limited to North Carolina.   In Michigan, Allied operated approximately fifty shadow branches, and in other states, as many as twenty shadow branches operated under a single HUD ID.

52.     According to witnesses, Allied operated shadow branches at least through 2010. One former employee tasked with obtaining FHA case numbers for FHA loans was instructed that for any branch that did not have a HUD ID, she should use the HUD ID of a nearby, approved branch.   Another former employee instructed to supply HUD IDs to shadow branches raised her concerns with Stell's assistant, who assured her that they were acting on Hodge's instruction and showed her a printed-out email from Hodge endorsing the practice.

53.     In sum, Allied operated hundreds of shadow branches at the direction of Hodge and to evade HUD oversight scrutiny.   As explained more fully below, Allied itself could not and did not audit and supervise all of its hundreds of branches, and, as long as Allied concealed these branches, HUD could not audit them either.   Allied nevertheless profited from these shadow branches and obtained FHA mortgage insurance for loans originated out of them by knowingly creating false records and certifications and submitting them to HUD.

54.     The Government estimates that Allied's shadow branches are responsible for defaulted loans resulting in at least $150 million in insurance claims paid by HUD.

### 2.   Allied Deceives HUD about Its Branch Operations

55.     Allied was equally deceptive about its practices at approved branches.   Each time Allied sought approval for one of its branch offices, it certified that it complied with HUD requirements and that it "paid the operating costs of the branch office."   These certifications were

16

knowingly false. Allied instead maximized its profits by opening and collecting revenue from more than 2000 branches, while failing to supervise and assume financial responsibility for them.

56.     In 2000, Allied's employment agreements with branch managers provided that (i) branch managers indemnify Allied from any and all claims, losses, damages, fines, and "liability of every kind;" (ii) branch managers be charged for core expenses, including "office space, telephones, facsimile machines, equipment, supplies, advertising, payroll expenses, and insurance;" and (iii) Allied could "require that a portion of the compensation, although earned by [the branch manager], be held in a reserve account for future possible losses or expenses incurred by [the branch manager]."

57.     When HUD audited Allied in early 2001, it found that Allied's employment agreement violated HUD requirements and, on April 23, 2001, notified Allied that it intended to seek civil penalties.

58.     Just one week later, on April 30, 2001, Allied issued an update to its operating manual to all branch managers, referencing HUD Mortgagee Letter 00-15 and stating that "[i]t is important that everyone understand that . . . [Allied] pays all of the operating expenses for each branch including . . . rent, equipment leases, phone bills, payroll and any other expenses incurred by the branch. [Allied] is also the lessee of the space occurred by the [Allied] branches."

59.     Shortly thereafter, Allied prepared an updated chapter on "Examination/Audit Procedure" to its manual, dated August 29, 2001, which provides instructions on steps to follow if a government auditor shows up at a branch, including the following:

- Select ONE PERSON, and one person ONLY in your office to interface and converse with the examiner/auditor . . . No one else in the office should have any conversation with the examiner/auditor prior to, during or after the examination/audit. The only corporate

17

personnel who should converse with the examiner/auditor prior to, during or after the exam/audit should be Jeanne Stell or Jim Hodge.   It is important to keep the number of people in contact with the examiner/auditor very limited."

- You, and any employee working in your branch, are W-2 employees of Allied. Frequently, examiners/auditors view us as a franchise.   WE ARE NOT A FRANCHISE. Along those same lines, Allied pays all the bills incurred by the branch.   **Both of these statements are true and that is the only way those questions are to be answered, *no deviations!* (bold and italics in original.)**

60.    Such a directive itself fails to comply with the HUD Handbook, which requires that a lender "fully cooperate with any investigations brought by HUD[,] . . . make all officers and employees available for interviews and [] promptly provide . . . information and documents requested by HUD."   4060.1, REV-2, paragraph 2-16 (B).

61.    On August 5, 2003, Allied entered into a consent decree with HUD, promising to comply with HUD's requirement that it pay operating costs of Allied's branch offices and paying a civil penalty of $50,000.   Again, that promise was false.

62.    Shortly thereafter, in January 2004, Allied applied to the State of New York Banking Department for a mortgage banker's license.   Because the State of New York has a similar prohibition against "net branching," Allied's application stated that "Allied has decided to cease using the term 'net branch' to describe its branch operations" and that "although the future compensation of the branch managers is [a]ffected by losses experienced by the branch, the branch manager has absolutely no liability to any third party associated with these losses."   That representation was false.

63.    Allied added that, should its application be accepted, it planned "to install a state manager in New York to monitor the company's growth and expansion in the State and to further

18

ensure strict compliance with all State and federal regulations . . . Allied's nationwide operations are in compliance with all aspects of HUD's requirements for branch offices of HUD/FHA approved mortgagees" (citing HUD Mortgagee Letter 00-15).   Despite Allied's representations to HUD and the New York Banking Department, Allied never changed its practices.

64.   Allied opened hundreds of branches in the years that followed, viewing the proliferation of branches as a "bragging point" and touted that it had "seven hundred plus branches" or was "on [its] way to a thousand branches."   Allied achieved such dramatic growth by recruiting branch managers with the promise that they could exercise greater control over their offices than they could as branch managers for Allied's competitors.   Allied's on-line advertising and website prominently displayed the motto "Better Than a Net Branch."

65.   Allied even encouraged its branch managers to earn more money by selling real estate as well as life insurance (through other Hodge-owned entities) out of their branches offices. In furtherance of this practice, until at least 2009, whenever a borrower submitted a loan application to Allied, the information in the application was uploaded simultaneously into Allied's loan origination database and into the database of Allied Mercantile Insurance Agency, an insurance company owned by Hodge and managed by Hodge's wife.   Although senior managers complained to Hodge about the perils of this practice, including that necessary state licenses were not obtained and that borrowers' confidential information was unprotected, Hodge rebuffed their concerns and told them to "get on the team."

66.   Allied also increased its loan production by means of a newly-established Hodge-owned, nonprofit organization—United American Housing and Education Foundation—which provided down payment assistance to homebuyers. - Until the IRS revoked its

19

tax exempt status in 2006, the non-profit provided assistance to homebuyers by receiving a "participation fee" from the seller or an affiliate in the approximate amount of the assistance provided to the buyer.   The non-profit collected millions of dollars in participation fees that were then applied as gift funds on mortgage loans originated by Allied.

67.    Allied's proliferation of branches came at little cost to the company.   Allied paid its branch managers pure commission, required them to set aside a "reserve" of several thousand dollars, failed to pay operating costs when branches were unprofitable, and continued to limit its financial obligation to its branches to month-to-month subleases.

68.    Allied supervised little more than the revenue of its branches.   Some branch managers operated for years without ever being audited by the corporate office.   And by early 2009, Allied discontinued on-site branch audits entirely.

69.    Some senior managers became so concerned about problem branches, and Hodge's unwillingness to close them down, that a group of six began holding secret meetings while Hodge was out of town.   The senior managers held these meetings, which they called "The Star Chamber," to close down problem branches that Hodge refused to close.   After a few months, however, the Star Chamber meetings were discontinued because Hodge repeatedly reopened branches after learning of their closure.

70.    When Hodge did decide to close a branch, it was summarily shut down, leaving the branch manager liable for long-term contractual commitments.   Allied even required branch managers to pay legal judgments against Allied when a lawsuit implicated conduct at their branch.

71.    For example, in 2006 a borrower sued Allied over the conduct of a loan officer at an Ohio branch.   Allied informed the branch manager that its legal department would handle the

lawsuit.   But after Allied was found to be liable, it settled the suit for $40,000 and sent the branch

manager the bill for the settlement amount.   When the manager asked why she was required to

pay when "we had insurance for this type of thing," Allied's corporate office replied, "I do not

believe there has ever been an actual judgment of money damages that was not assessed against

branch revenue . . . [I]f the case goes to trial and a judgment is entered . . . it is considered a branch

operating expense."

72.     In 2007, Allied shut down a branch in Massachusetts, leaving the manager liable

for more than a hundred thousand dollars on a multi-year commercial lease.   When the landlord

demanded that Allied pay the rent, Allied refused, stating that "[w]hile Allied made rent payments

. . . for several years, those payments were made on behalf of [the branch manager] in order to

allow him to meet *his* obligations to you under his lease(s) with you" (italics in original).

73.     In 2008, after Allied shut down a branch in Michigan, the branch manager was

sued by the landlord for more than $17,000 in remaining rent owed on his two-year commercial

lease and had a judgment entered against him.

74.     Later in 2008, acting on a HUD hotline tip from a former Allied employee, HUD

conducted a second audit of five branch offices to determine whether Allied was engaging in

prohibited branch operations.   HUD issued its audit report as to these branches on February 10,

2009, finding that Allied violated HUD guidelines on branch operations and recommending action

by the Mortgagee Review Board.   Specifically, HUD found that:

> [n]one of the office space lease agreements for the five branches reviewed were in Allied's
> name.   Instead, the branch managers personally entered into and signed the lease
> agreements.   Four of the five branch managers had signed month-to-month subleases with
> Allied . . . However, ultimate responsibility for the lease payments continued to rest with
> the branch manager if Allied canceled the sublease . . . By not directly entering into leases,

21

Allied apparently attempted to main a separation between itself and its branch offices which was inconsistent with the close supervisory control and oversight of its branches required by HUD   (citing HUD Mortgagee Approval Handbook 4060.1, REV-2, paragraphs 2-9 A and D).

75.    Just days after the 2009 audit report was issued, Stell (who had left Allied temporarily in November of 2008) emailed a link to the audit report to another former employee, who replied that HUD's order requiring "Allied to . . . directly enter into leases and/or agreements and implement the necessary policies, systems, and controls to ensure that it pays all required branch operating costs" was "going to be a big one to comply with."

76.    In response, Stell wrote:  "What do you think about the part that they want the [HUD] to go after not just Allied but the people responsible for non-compliance.   I had [another senior manager] sign the 'add a branch' form for years for HUD as I knew this would eventually happen.   It required that you swear the branches meet and will continue to meet HUD's regulations.   Jim [Hodge] has to be the biggest target personally for his disregard for the regulations.   Serves him right never listening and thinking he didn't have to play by the rules." (Exhibit 1.)

77.    Allied refused to change its practices even after the 2009 HUD audit report issued. In May of 2009, when the landlord of a recently-closed Missouri branch office sued both Allied and the branch manager for rent due on a five-year commercial lease, Allied filed a cross-claim against the branch manager, alleging that "[b]ecause [the manager], rather than Allied, is liable on the Lease . . ., [he] would be liable to Allied for all such liability, and Allied is entitled to indemnification for all such liability."

22

78.     In responding to HUD, Allied's attorneys presented a different picture. Specifically, Allied's attorneys represented that "Allied did pay the core expenses for the five branch offices reviewed 95% of the time and we are confident with the new operations changes as of today we are 100% compliant and will maintain that level on an ongoing basis."

79.     Even today, however, Allied remains willfully noncompliant.  On January 26, 2011, an Iowa branch manager was informed that her branch would be closed that day and that she would be transferred to an office in Illinois as a loan officer (even though she had no Illinois license).  As the signatory on all branch contracts, the manager asked the corporate office what Allied planned to do "about these leases or am I going to be left holding the bag?"  In response, Hodge emailed, "Allied corp policy is only a month to month lease we have no control over what you sign or do."  Later that day, the branch manager received a call from Hodge's assistant informing her that she would be terminated.

80.     In sum, Allied has willfully flouted HUD's requirement since at least 2000, and has attempted to conceal its practices by submitting false branch certifications to HUD, misrepresenting Allied's practices in responding to HUD audits, and instructing its employees how to (untruthfully) answer questions from HUD and other auditors.  Allied's "net branch" system enabled it to open more than 2000 branches, far more than it could supervise and control.

### 3.  Allied Fails to Implement a Quality Control Program

81.     Given that Allied was operating hundreds of branches under the regulatory radar, Allied alone was responsible for monitoring these branches and their loans.   And as a HUD-approved lender, Allied was required to maintain a quality control plan that included:  (a) conducting audits on all early payment defaults; (b) reviewing 10% of all closed-loan files; and (c)

23

conducting on-site branch office reviews within 90 days of opening and once per year thereafter. Allied's quality control program, however, was either dysfunctional or entirely nonexistent during most of the last decade.

82.   Allied conducted on-site branch office audits only sporadically, at best.   Although Allied operated between 400 and 650 branches at any given time between 2003 and early 2009, it typically maintained only three branch auditors, and those three auditors had other responsibilities in addition to conducting branch audits.   As stated above, some long-time branch managers were never visited by the corporate office, and by 2009, Allied discontinued branch audits entirely.

83.   Allied's review of early payment defaults was equally deficient.   When Allied hired a new quality control manager in August of 2004, she discovered that Allied was not reviewing early payment defaults and was informed by Stell (incorrectly) that Allied was not required to conduct such reviews.   Similarly, a HUD audit of Allied's quality control department in late 2004 concluded that Allied "was not doing EPD reviews" and that the only two quality control reports Allied produced to HUD "contain[ed] no information of use."   Allied did not even begin conducting reviews of early payment defaults until late 2005 or early 2006.

84.   When Allied eventually began conducting reviews of early payment defaults, it was plagued by inadequate and unqualified staffing.   Between 2004 and 2008, Allied was originating loans out of several hundred branches, yet had a quality control staff of just *two* in its corporate office to conduct reviews of all early payment defaults.   Allied maintained an additional 2-5 members of its quality control department in St. Croix, in the U.S. Virgin Islands.   When the quality control manager visited her staff in St. Croix, however, she discovered that they did not know "what HUD was," or even "what a mortgage was."

24

85.     Despite their lack of qualifications, the St. Croix-based employees were hired to work for another Hodge-owned entity called "Allquest Mortgage Capital Corporation," an economic development corporation.  As an economic development corporation, Allquest was entitled to receive a 90% reduction in income taxes.  In exchange for providing nominal quality control services to Allied, Allquest received millions of dollars in management fees that Allied then deducted as business expenses.

86.     According to numerous witnesses, Allied's offshore quality control department did little substantive work.  And when HUD conducted a limited audit of Allied in 2007, it again found that Allied "has not implemented a Quality Control (QC) Plan and is not conducting Quality Control reviews in accordance with HUD criteria."

87.     In October 2008, Allied abruptly fired its quality control manager, informing her that her position was being "eliminated."  Shortly thereafter, however, Allied was asked to provide up-to-date quality control reports to HUD as it was concluding its audit.  Allied did not have the reports available, as it was months behind in reviews of early payment defaults.

88.     Allied initially attempted to prepare the reports by assigning a few underwriting assistants to assist with the reports.  The assistants were provided no training but simply handed a checklist of questions to answer as they reviewed each file.  One of the assistants complained that she did not know what she was looking for in the loan file, but was told just to work from the checklist.

89.     Another member of the quality control department reported to Hodge that even with the help from underwriting assistants, the department could not complete the quality control reports on time.  Hodge instructed her to make the reports appear complete by indicating that

25

verifications of income, employment, and deposit had been conducted.   The employees followed Hodge's instructions and prepared fraudulent quality control reports, which were then submitted to HUD.

### 4.  Allied Conceals Sanctions and Convictions from HUD

90.     In addition to concealing its branch operations and lack of quality control from HUD, Allied concealed prior sanctions and convictions that could have alerted HUD to the risk that Allied posed to its insurance fund.

91.     To maintain its HUD-approved status, Allied was required to certify each year not only that it complied with all HUD/FHA requirements, but also that it satisfied two more specific conditions.   First, Allied was required to certify that:   "none of the . . . employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction . . . limited denial of participation, [or] suspension . . . by a federal, state, or local government."   Second, Allied was required to certify that it "has not been refused a license and has not been sanctioned by any state(s)" in which it originates loans.

92.     The HUD Handbook provides that mortgagees are "ineligible" for approval by HUD if, among other things, any officer, partner, director, principal, or employee of the lender is "[u]nder indictment for, or has been convicted of, an offense that reflects adversely upon the applicant's integrity, competence, or fitness to meet the responsibilities of an approved mortgagee [or] [s]ubject to unresolved findings contained in a HUD or other governmental audit, investigation . . ."   4060.1, REV-2, paragraph 2-10.   *See also* 24 C.F.R. 202.5.

93.     Further, a lender that has been subject to a sanction or action against its state license "must submit documentation concerning the action."   HUD Handbook 4060.1, REV-2, paragraph

26

2-3.   Information about sanctions and other government actions is useful to HUD to ensure that its approved lenders are properly supervising their branches and screening the employees they hire.

94.   Allied has concealed numerous sanctions and employee convictions in recent years, although just a few examples are set forth below.

95.   In June 2004, Allied entered into a consent agreement with the Rhode Island Department of Business Regulation, paying $50,000 and acknowledging that an Allied branch manager was using his Rhode Island license to operate an unlicensed branch across state lines in Milford, Massachusetts.

96.   In December 2005, the South Carolina Department of Consumer Affairs denied a license to a former branch manager in Goose Creek, South Carolina, based on its finding that she had "been convicted of several offenses within the last ten years."   The Goose Creek branch also operated as a shadow branch.

97.   In February 2006, the State of Washington Department of Financial Institutions banned Allied's former branch manager in Spokane, Washington, from working as a mortgage broker after he was convicted of stealing client's money and laundering it.   The Spokane branch also operated as a shadow branch.

98.   In May 2006, Allied filed an annual report with the New York State Banking Department, which required it to answer whether any convicted felon served as an employee "during the reported year or any time since."   In response, Allied identified fifteen employees with felony convictions that it had hired (and terminated) in just the 12-month reporting cycle. Allied added, however, that it "conducts criminal background investigations on all new

employees," that "no person convicted of a felony may be hired in any capacity," and that "[n]o current company employees have felony convictions."

99.     In July 2006, the Arizona Department of Financial Institutions denied a mortgage broker license to a separate firm owned by Allied's branch manager in Tucson, Arizona, because the branch manager had been previously convicted of stealing money while working as a bank teller for Bank of America.   The Tucson branch also operated as a shadow branch.

100.     In November 2007, Allied paid $30,000 and entered into a second consent agreement with the Rhode Island Department of Business Regulation, resulting from an examination that found six separate violations of Rhode Island law, four of which were recurring violations.

101.     Also in November 2007, Allied entered into a settlement agreement with the U.S. Department of Labor, agreeing to pay $1.9 million in back wages owed to employees.

102.     In December 2007, Allied's compliance department shut down a shadow branch in Conyers, Georgia, after verifying a tip that the branch manager was a convicted felon running the branch under a fraudulently-obtained identity.

103.     In September 2009, when Allied applied for a New York State mortgage broker license, it named as its proposed state manager (the individual tasked with ensuring compliance with all state and federal regulations) a convicted felon who had been sentenced to 60 months in prison for distributing methamphetamines.   The employee worked for Allied since 1998 and had been the state manager for New Jersey since 2007, where he was responsible for overseeing fifty-six branches.   Despite the employee's long tenure with Allied, he was not identified on

28

Allied's list of employees with felony convictions provided to the state banking department, nor were any of the other individuals referred to above.

104.    Allied should have faced additional state sanctions but avoided them by deception. Among other things, Allied sought to save money on state-required surety bonds by having them issued from a Hodge-owned entity in the Cook Islands, Mercantile Insurance & Fidelity Company. The purpose of such bonds is to assure the recovery of penalties imposed by state regulators for non-compliance with regulations.   Although Mercantile was little more than a shell company and was not licensed to issue bonds in any state, the licensing department was "told to write bonds in all states until 'something happened'."

105.    As the senior compliance officer, Stell had knowledge of all of the above issues, yet submitted unqualified annual certifications in 2006 and 2007.   The annual certifications submitted to HUD were therefore knowingly false.

106.·    Allied's concealed corruption continued in part because Hodge persistently monitored and intimidated senior managers and other employees.   For instance, Hodge provided his assistant with full access (including the ability to delete emails) to the email accounts of several key employees, including Allied's general counsel, senior compliance officers, quality control managers, and others.   Hodge also instructed his Chief Information Officer to capture the password of Stell's personal email account and installed an electronic listening device under the desk in the CIO's office.

107.    Hodge also required employees to sign extremely broad confidentiality agreements and has sued numerous former employees for the slightest perceived breach, including a former tax manager for speaking to the IRS.   In one recent such action, when Stell was asked what a

former employee of Allied could say that was *not* confidential, she responded: "just what a good

company it is."

108.    Under the direction of Hodge, Allied has therefore engaged in a pattern of

deception for at least a decade, attempting to evade regulatory scrutiny, and, when confronted,

lying to protect its profitable position in the FHA mortgage market.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1)(B))
### Use of False Statements—False Loan Certifications to HUD

109.    The Government incorporates by reference each of the preceding paragraphs as if

fully set forth in this paragraph.

110.    By virtue of the acts described above, and in violation of 31 U.S.C. §

3729(a)(1)(B), for each of the loans originated from shadow branches and submitted to HUD for

FHA mortgage insurance, Allied and Allied Home Mortgage (as the successor to Allied),

knowingly made, used, or caused to be made or used, false records or statements material to a false

or fraudulent claim for payment or approval by the United States.

111.    By directing the use of borrowed HUD IDs to originate loans from shadow

branches, for each of the loans originated from shadow branches and submitted to HUD for FHA

mortgage insurance, Hodge knowingly made, used, or caused to be made or used, false records or

statements material to a false or fraudulent claim for payment or approval by the United States.

112.    The Government paid insurance claims, and incurred losses, relating to

FHA-insured mortgages based on the misrepresentation that the mortgage was originated in

accordance with HUD requirements, including that it was originated by a HUD-approved branch.

30

113.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Allied, Allied Home Mortgage, and Hodge are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the United States has sustained because of the defendants' actions.

## SECOND CLAIM

### Indemnification
### False Loan Certifications to HUD

114.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

115.    By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD mortgage insurance, for each of the loans originated from shadow branches that is currently in default, but for which no insurance claim has been submitted to HUD, Allied and Allied Home Mortgage (as the successor to Allied) knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD.

116.    By directing the use of borrowed HUD IDs to originate loans from shadow branches, for each of the loans originated from shadow branches that is currently in default, but for which no insurance claim has been submitted to HUD, Hodge knowingly caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States.

31

117.    As a result of the false or fraudulent records, statements, or certifications submitted to HUD on each of the loans originated out of a shadow branch, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages originated by Allied.

118.    Accordingly, the Government is entitled to indemnification of its losses from Allied, Allied Home Mortgage, and Hodge.

## THIRD CLAIM

**Violations of FIRREA**
**(12 U.S.C. § 1833a)**
**False Loan Certifications to HUD**

119.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

120.    By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD mortgage insurance in violation of 12 U.S.C. § 1833a, for each of the loans originated from shadow branches that is currently in default, but for which no insurance claim has been submitted to HUD, Allied, Allied Home Mortgage (as the successor to Allied), and Hodge knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD in violation of 18 U.S.C. § § 1006 and 1014.

121.    Defendants Allied and Allied Home Mortgage (a) made statements to HUD with the intent to defraud or deceive HUD into providing mortgage insurance (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

32

122.   Defendant Hodge, as an officer and agent of a mortgage corporation, (a) caused statements to be made to HUD with the intent to defraud or deceive HUD into providing mortgage insurance (18 U.S.C. § 1006); and (b) knowingly caused false statements to be made for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

123.   Accordingly, for each of the loans originated out of a shadow branch that is in default but on which no claim has been made, Allied, Allied Home Mortgage, and Hodge are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## FOURTH CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1)(B))
### Use of False Statements-- False Branch Certifications to HUD

124.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

125.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of fraudulently obtaining HUD approval for Allied's branches, Allied, Allied Home Mortgage (as the successor to Allied), and Stell caused to be made or used false certifications to HUD for each of the branches for which Allied sought approval.

126.   By knowingly submitting false branch certifications to HUD, Allied, Allied Home Mortgage (as the successor to Allied), and Stell knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States.

127.   The Government paid insurance claims, and incurred losses, relating to FHA-insured mortgages originated out of Allied's approved branched based on the misrepresentation that Allied maintained the branch in compliance with HUD requirements, including that it paid the operating costs for the branch.

127.   Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Allied, Allied Home Mortgage, and Stell are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the United States has sustained because of the defendants' actions.

### FIFTH CLAIM

**Violations of FIRREA
(12 U.S.C. § 1833a)
False Branch Certifications to HUD**

128.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

129.   By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD approval for Allied's branches, Allied, Allied Home Mortgage (as the successor to Allied), and Stell knowingly made, used, or caused to be made or used, false certifications and submitted such false certifications to HUD in violation of 18 U.S.C. § § 1006 and 1014.

130.   Defendants Allied and Allied Home Mortgage (a) made statements to HUD with the intent to defraud or deceive HUD into approving branches for the origination of FHA loans (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

34

131.    Defendant Stell, as an officer and agent of a mortgage corporation, (a) made and caused to be made statements to HUD with the intent to defraud or deceive HUD into approving branches for the origination of FHA loans (18 U.S.C. § 1006); and (b) knowingly made and caused to be made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

132.    Accordingly, for each of the false certifications submitted to HUD, defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

### SIXTH CLAIM

**Violations of FIRREA**
**(12 U.S.C. § 1833a)**
**False Annual Certifications to HUD**

133.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

134.    By virtue of the acts described above, and for the purpose of fraudulently maintaining HUD approval in the loan correspondent program, Allied and Allied Home Mortgage (as the successor to Allied), and Stell knowingly made, used, or caused to be made or used, false annual certifications stating that Allied complied with all HUD/FHA requirements, that none of its employees had a criminal conviction, and that it had not been subject to sanctions in any state in which it operated.   Allied submitted such false certifications to HUD in violation of 18 U.S.C. § § 1006 and 1014.

135.    Defendants Allied and Allied Home Mortgage (a) made statements to HUD with the intent to defraud or deceive HUD into maintaining its approval (18 U.S.C. § 1006); and (b)

knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

136.   Defendant Stell, as an officer and agent of a mortgage corporation, (a) made statements to HUD with the intent to defraud or deceive HUD into maintaining its approval (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

137.   The false annual certifications for 2006 and 2007 deceived HUD into maintaining Allied as an approved HUD loan correspondent and resulted in HUD paying insurance claims in the amount of $170 million on loans originated in those two years.

138.   Accordingly, for the 2006 and 2007 false annual certifications submitted to HUD, Allied, Allied Home Mortgage, and Stell are liable for the losses to HUD as authorized under 12 U.S.C. § 1833a.

## SEVENTH CLAIM

### Violations of FIRREA
### (12 U.S.C. § 1833a)
### False Annual Certifications to HUD

139.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

140.   By virtue of the acts described above, and for the purpose of fraudulently maintaining HUD approval in the loan correspondent program, Allied and Allied Home Mortgage (as the successor to Allied), and Stell knowingly made, used, or caused to be made or used, false annual certifications stating that Allied complied with all HUD/FHA requirements, that none of its employees had a criminal conviction, and that it had not been subject to sanctions in any state in

36

which it operated. Allied submitted such false certifications to HUD in violation of 18 U.S.C. § § 1006 and 1014.

141.   Defendants Allied and Allied Home Mortgage (a) made statements to HUD with the intent to defraud or deceive HUD into maintaining its approval (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

142.   Defendant Stell, as an officer and agent of a mortgage corporation, (a) made statements to HUD with the intent to defraud or deceive HUD into maintaining its approval (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

143.   Accordingly, for the 2006 and 2007 false annual certifications submitted to HUD, Allied, Allied Home Mortgage, and Stell are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## EIGHTH CLAIM

### Violations of FIRREA
### (12 U.S.C. § 1833a)
### False Statements to HUD

144.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

145.   By virtue of the acts described above, and for the purpose of fraudulently concealing from HUD Allied's lack of quality control, Allied, Allied Home Mortgage (as the successor to Allied), and Hodge knowingly made, used, or caused to be made false statements to

HUD and made, used, or caused to be made false and fraudulent records and submitted such false and fraudulent records to HUD in violation of 18 U.S.C. § § 1006 and 1014.

146.    Defendants Allied and Allied Home Mortgage (a) made statements to HUD with the intent to defraud or deceive HUD concerning Allied's maintenance of a quality control plan (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

147.    Defendant Hodge, as an officer and agent of a mortgage corporation, (a) caused statements to be made to HUD with the intent to defraud or deceive HUD concerning Allied's maintenance of a quality control plan (18 U.S.C. § 1006); and (b) knowingly caused false statements to be made for the purpose of influencing the FHA (18 U.S.C. § 1014, as amended).

148.    Accordingly, for each of the false statements and records submitted to HUD, Allied, Allied Home Mortgage, and Hodge are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## NINTH CLAIM

### Fraud Injunction Statute
### (18 U.S.C. § 1345)

149.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

150.    Allied, Allied Home Mortgage (as the successor to Allied), and Hodge have knowingly and intentionally submitted false loan certifications to HUD by originating FHA loans out of shadow branches, in violation of 18 U.S.C. § 1006.

151.   As set forth above, Allied Home Mortgage continues to originate loans out of shadow branches and submit those loans for FHA mortgage insurance based on false certifications that the loans were originated in accordance with HUD/FHA requirements, including that the loans were originated from HUD-approved branches.

152.   Allied Home Mortgage's continuing fraud poses the prospect of a continuing and substantial injury to the United States, the HUD insurance fund, and the secondary marketplace for mortgage loans.

153.   Accordingly, Allied Home Mortgage's ongoing fraudulent conduct should be enjoined pursuant to 18 U.S.C. § 1345.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Allied, Allied Home Mortgage, Hodge, and Stell as follows:

a.   On Count One (FCA), judgment for the Government against Allied, Allied Home Mortgage, and Hodge, treble the Government's damages from defaulted loans from shadow branches that have resulted in claims paid by the Government, and civil penalties for the maximum amount allowed by law;

b.   On Count Two (Indemnification), judgment for the Government against Allied, Allied Home Mortgage, and Hodge, and indemnification for the Government's losses on loans from shadow branches that are in default but on which no claim has been paid;

c.   On Count Three (FCA), judgment for the Government against Allied, Allied Home Mortgage, and Stell, treble the Government's damages from defaulted loans from approved branches that have resulted in claims paid by the Government, and civil penalties for the maximum amount allowed by law;

39

d.      On Count Four, (FIRREA), judgment for the Government against Allied, Allied Home Mortgage, and Hodge, civil penalties up to the maximum amount of $1,000,000, or the amount of gain to the defendants, or, if greater, the amount of the loss to HUD stemming from such conduct;

e.      On Counts Five, Six, and Seven (FIRREA), judgment for the Government against Allied, Allied Home Mortgage, and Stell, civil penalties under each claim up to the maximum amount of $1,000,000, or the amount of gain to the defendants, or, if greater, the amount of the loss to HUD stemming from such conduct;

f.      On Count Eight (FIRREA), judgment for the Government against Allied, Allied Home Mortgage, and Hodge, civil penalties up to the maximum amount of $1,000,000, or the amount of gain to the defendants, or, if greater, the amount of the loss to HUD stemming from such conduct;

g.      On Count Nine (Fraud Injunction Statute), the entry of a permanent injunction against Allied Home Mortgage prohibiting it from originating any FHA loans out of branches that are not approved by HUD;

h.      For an award of costs pursuant to 31 U.S.C. § 3729(a); and

i.      For an award of any such further relief as is proper.

Dated:   New York, New York
         November 1, 2011

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States

                       By:   _____
                              JAIMIE L. NAWADAY
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Telephone No. (212) 637-2528
                              Facsimile No. (212) 637-2730
                              jaimie.nawaday@usdoj.gov